# Illinois Official Reports

## Appellate Court

***Travelers Property Casualty Co. of America v. ArcelorMittal USA Inc.,***
**2019 IL App (1st) 180129**

| | |
|---|---|
| Appellate Court Caption | TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, as Subrogee of Gallo Equipment Co., Plaintiff-Appellee, v. ARCELORMITTAL USA INC., Defendant and Third-Party Plaintiff-Appellant (Gallo Equipment Co., Third-Party Defendant-Appellee). |
| District & No. | First District, First Division<br>Docket No. 1-18-0129 |
| Filed | March 11, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-L-6441; the Hon. Raymond W. Mitchell, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | David E. Kawala, Catherine Basque Weiler, and T. Allon Renfro, of Swanson, Martin & Bell, LLP, of Chicago, for appellant.<br><br>W. Gregory Aimonette, Joseph J. Ferrini, and Kenneth R. Wysocki, of Clausen Miller P.C., of Chicago, for appellees. |

| Panel | JUSTICE PIERCE delivered the judgment of the court, with opinion. Presiding Justice Mikva and Justice Walker concurred in the judgment and opinion. |

## OPINION

¶ 1    Plaintiff, Travelers Property Casualty Company of America (Travelers), as subrogee of Gallo Equipment Co. (Gallo), filed this breach of contract action against ArcelorMittal USA Inc. (ArcelorMittal). ArcelorMittal then filed a third-party breach of contract complaint against Gallo. The circuit court of Cook County ultimately entered summary judgment in favor of Travelers, awarded Travelers damages, and dismissed ArcelorMittal's third-party claim against Gallo. ArcelorMittal appeals from the circuit court's entry of summary judgment in favor of Travelers, and from the dismissal of its third-party breach of contract claim against Gallo. We affirm.

¶ 2                                I. BACKGROUND

¶ 3    ArcelorMittal leased lift truck tractors (which are essentially forklifts with detachable masts) from Gallo pursuant to a written equipment supply contract (supply contract) dated January 1, 2011. ArcelorMittal used the tractors to move steel coils at its steel fabrication mill in East Chicago, Indiana. In September 2012, one of the leased tractors caught fire at the East Chicago mill. The tractor, which Gallo purchased in 2005, was maintained by ArcelorMittal mechanics under the direction and supervision of a Gallo employee. The fire reportedly started as a result of a fuel hose being improperly routed across the engine during an earlier repair. Although it was not established when that repair was done or who made that repair, there is no dispute that ArcelorMittal was responsible for the loss. ArcelorMittal offered to compensate Gallo for the tractor, but Gallo rejected the offer as too low. Gallo then submitted a claim to its insurer, Travelers, under an inland marine policy. Travelers settled Gallo's claim for $305,625.

¶ 4    In June 2015, Travelers, as subrogee of Gallo, filed a two-count complaint against ArcelorMittal for negligence and breach of contract. Travelers voluntarily dismissed its negligence claim, and therefore Travelers' only claim before us is its breach of contract claim. Travelers alleged that under the terms of the supply contract, ArcelorMittal was responsible for any damage to the tractor that occurred while ArcelorMittal was using it and that ArcelorMittal was liable for the cost to replace or repair the tractor. Travelers paid Gallo's claim filed under an inland marine policy issued by Travelers and sought recovery from ArcelorMittal of the amount paid to Gallo. ArcelorMittal answered the complaint, and the parties engaged in discovery.

¶ 5    ArcelorMittal moved for summary judgment on Travelers' breach of contract claim, arguing that Travelers was barred from asserting a subrogation claim because the supply contract required Gallo to obtain subrogation waivers from its insurers for claims arising out of the supply contract. Travelers filed a cross-motion for summary judgment on its breach of contract claim, arguing that ArcelorMittal was responsible for damage to the tractor under the supply contract, that ArcelorMittal failed to resolve Gallo's claim under ArcelorMittal's self-insurance program, and that the correct measure of damages was $318,000, based on the testimony of Michael Gallo and supported by a repair quote that Gallo received. After the

cross-motions for summary judgment were briefed, the circuit court, in a written order, granted Travelers' motion for summary judgment and awarded Travelers $305,625. The circuit court denied ArcelorMittal's motion for summary judgment.

¶ 6 While the motions for summary judgment were being briefed, ArcelorMittal was granted leave to file a third-party complaint against Gallo and ultimately filed a third amended third-party complaint. The only third-party claim relevant to this appeal is ArcelorMittal's claim that Gallo breached the supply contract by failing to obtain a subrogation waiver in the Travelers inland marine policy that provided coverage for the damaged tractor. The circuit court ultimately granted Gallo's motion to dismiss ArcelorMittal's third-party breach of contract claim pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2016)), finding that Gallo did not breach the supply agreement by obtaining the inland marine coverage without securing a subrogation waiver.

¶ 7 ArcelorMittal filed a timely notice of appeal from the circuit court's orders entering summary judgment in favor of Travelers, denying ArcelorMittal's motion for summary judgment, and dismissing ArcelorMittal's third-party breach of contract claim against Gallo.

¶ 8                                             II. ANALYSIS

¶ 9 On appeal, ArcelorMittal argues that summary judgment in favor of Travelers on Travelers' breach of contract claim was in error because, under the supply contract, Gallo was required to obtain insurance policies that contained subrogation waivers. Alternatively, ArcelorMittal argues that there were questions of fact on the issue of damages that preclude summary judgment. Finally, ArcelorMittal argues that, in the event that we reverse the entry of summary judgment in favor of Travelers, we should reinstate ArcelorMittal's third-party breach of contract claim against Gallo. We address these arguments in turn.

¶ 10 As an initial matter, the supply contract provides that any dispute would be governed by the law of the state in which the job site was located, which in this case was Indiana. No party raises any challenge on appeal to the application of Indiana law. Therefore, we apply the procedural law of Illinois and apply the substantive law of Indiana. *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 351 (2002).

¶ 11 Summary judgment is appropriate if the pleadings, depositions, affidavits, and other admissions on file establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2016); *Cohen v. Chicago Park District*, 2017 IL 121800, ¶ 17. The purpose of summary judgment is not to try a question of fact but rather to determine whether one exists. *Robidoux v. Oliphant*, 201 Ill. 2d 324, 335 (2002). When the parties file cross-motions for summary judgment on the same issue, they typically agree that only a question of law is involved and invite the circuit court to decide the case based on the record before it. *Pielet v. Pielet*, 2012 IL 112064, ¶¶ 28, 30. Summary judgment may be granted on cross-motions for summary judgment where it is clear that all material facts are before the court, the issues are defined, and the parties agree that only a question of law is involved. *Haberer v. Village of Sauget*, 158 Ill. App. 3d 313, 317 (1987) (citing *Allen v. Meyer*, 14 Ill. 2d 284, 292 (1958)). The mere filing of cross-motions for summary judgment, however, does not obligate the circuit court to grant one of the motions (*Pielet*, 2012 IL 112064, ¶ 28), and if reasonable people could draw different inferences from the undisputed facts, summary judgment is inappropriate (*Danada Square, LLC v. KFC National Management Co.*, 392 Ill. App. 3d 598, 607 (2009) (citing *Mountbatten Surety Co. v.*

*Szabo Contracting, Inc.*, 349 Ill. App. 3d 857, 867 (2004))). "In determining whether a genuine issue of material fact exists, the court must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the nonmovant." *West Bend Mutual Insurance Co. v. DJW-Ridgeway Building Consultants, Inc.*, 2015 IL App (2d) 140441, ¶ 20. A party moving for summary judgment bears the initial burden of production and may satisfy it by either showing that some element of the case must be resolved in its favor or that there is an absence of evidence to support the nonmoving party's case. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). Once the moving party satisfies that initial burden, the burden shifts to the nonmoving party to come forward with some factual basis that would entitle it to a favorable judgment. *Id.* "Evidence not admissible at trial cannot be used to support or oppose a motion for summary judgment." *Rodriguez v. Frankie's Beef/Pasta & Catering*, 2012 IL App (1st) 113155, ¶ 14. We review a circuit court's ruling on summary judgment *de novo*. *Standard Mutual Insurance Co. v. Lay*, 2013 IL 114617, ¶ 15.

¶ 12    Indiana courts "ascertain the intent of the parties at the time the contract was made, as disclosed by the language used to express the parties' rights and duties." *Ryan v. TCI Architects/Engineers/Contractors, Inc.*, 72 N.E.3d 908, 914 (Ind. 2017). "A contract's clear and unambiguous language is given its ordinary meaning." *Id.* A contract should be construed so as to not render any words, phrases, or terms ineffective or meaningless. *Id.* If the language of a contract is found to be ambiguous, "the contract terms must be construed to determine and give effect to the intent of the parties when they entered into the contract." *Celadon Trucking Services, Inc. v. Wilmoth*, 70 N.E.3d 833, 839 (Ind. Ct. App. 2017). "An ambiguous contract should be construed against the party who furnished and drafted the agreement." *Id.*

¶ 13    First, ArcelorMittal argues that, "under the plain, clear language of that contract, the parties intended that Gallo's insurance policies would provide that all rights of subrogation against ArcelorMittal were waived, unless the damage resulted from ArcelorMittal's gross negligence or willful misconduct." Several provisions of the supply contract are relevant to our analysis. Section 1(j) defines "Equipment." Section 1(j)(1) defines "Bare Equipment" as "Equipment which shall be operated solely by [AcelorMittal's] employees and/or agents." Section 1(j)(2) defines "Operated Equipment" as "Equipment which shall be operated solely by [Gallo's] employees and/or agents." The parties agree that the damaged lift truck was "Bare Equipment."

¶ 14    Section 4(a) apportions the risk of loss and provides

> "[Gallo] shall be responsible for all loss and damage to the Equipment: (i) prior to [Gallo's] delivery of the Equipment to the Facility, subject to the provisions of Section 5 below; (ii) at all times when the Equipment is in [Gallo's] sole possession, including but not limited to when the applicable Purchase Order provides that the Equipment shall be used or operated solely as Operated Equipment, for the duration of the Work; and (iii) upon [ArcelorMittal's] notification of return of the Equipment or [Gallo] or [Gallo's] agent at the Facility. At all other times risk of loss or damage shall be the responsibility of [ArcelorMittal]."

¶ 15    Section 5(e) provides, in relevant part, "For Bare Equipment, [ArcelorMittal] agrees to maintain the Equipment on a daily and other periodic basis as prescribed in the manufacturer's instruction manual and as required by good industry practice ***. [ArcelorMittal] acknowledges that [Gallo] has no responsibility to inspect the Equipment while it is in [ArcelorMittal's] possession." Section 6(b) provides that ArcelorMittal "shall be responsible

- 4 -

for the cost to repair or replace Equipment rendered inoperable by misuse, abuse or neglect, or any event for which [ArcelorMittal] has the risk of loss in accordance with Section 4(a) hereof."

¶ 16    Section 11 relates to insurance, and provides,

"(a) Each party is obligated to and shall provide and pay for the following insurance:

(i) Workers' compensation ***.

(ii) Employer's liability insurance ***.

(iii) Commercial general liability insurance coverage (including Products/Completed Operations Liability, coverage [*sic*] and contractual liability coverage's [*sic*]) in an amount not less than $5,000,000 per occurrence combined single limit on all operations for bodily injury and property damage liability arising out of said operations.

(iv) Commercial automobile (including all motor vehicles) liability insurance coverage (including coverage for owned, hired and non-owned motor vehicles) ***.

(v) Umbrella or excess liability policy excess of coverage's provided in paragraphs (ii) and (iii) ***.

[ArcelorMittal] reserves the right to self-insure the aforementioned insurance requirements as set forth in subsection 11(g) below."

¶ 17    Section 11(b) provides,

"*For the coverage described above*, [ArcelorMittal] shall be added as an additional insured for all claims including, but not limited to, claims by [Gallo's] employees or their personal representatives, heirs and beneficiaries. [Gallo's] insurance policies *described above* shall provide that all rights of subrogation against [ArcelorMittal] and its affiliates are waived, except in the case of [ArcelorMittal's] gross negligence or willful misconduct. [ArcelorMittal's] insurance requirements shall be primary to any [Gallo] insurance or self-retention." (Emphases added.)

¶ 18    Section 11(g) provides

"For Bare Equipment, [ArcelorMittal] maintains a self-insurance program *** designed to cover exposure for losses or damages to equipment and/or other personal property, including leased and rented equipment of the type provided under this Agreement. [ArcelorMittal] shall provide [Gallo] with a written statement of such Program signed by an authorized representative of [ArcelorMittal] and in a form and content reasonably acceptable to [Gallo]. Any and all claims for loss or damage to the Equipment shall be adjusted by [ArcelorMittal] in the same manner and to the same extent as if a separate all-risk property insurance policy was in place to cover such Equipment. Notwithstanding the above, [Gallo] shall be responsible for any losses or events arising out of reasonable wear and tear."

¶ 19    ArcelorMittal's argument that, under the terms of section 11(b), the parties intended for Gallo to obtain subrogation waivers for all of its insurance policies is not supported by the plain language of the agreement. Section 11(b) clearly provides that it applies to "the coverage described above." Section 11(a) sets forth five specific types of insurance that Gallo was required to maintain. A common sense reading of section 11(b) shows that the only "coverage described above" are the specific coverages identified in section 11(a), and that for those five

specific types of insurance, Gallo was required to add ArcelorMittal as an additional insured and waive subrogation under those five types of policies. There is no catch-all provision in section 11 that extends the requirements of section 11(b) to other insurance policies that Gallo maintained—such as the inland marine policy issued by Travelers—that were not specifically identified in section 11(a). In other words, the plain language of the agreement does not reflect an intent to capture and subjugate every insurance policy issued to Gallo to the section 11(b) subrogation waiver. Instead, the plain language of the supply contract requires both ArcelorMittal and Gallo to have or to obtain five specific types of insurance coverage and, in Gallo's case, Gallo was required to obtain a subrogation waiver for each of those specific coverages. The inland marine policy under which Gallo submitted its a claim was not one of the policies enumerated in section 11(a) of the supply contract, and nothing in the plain language of the agreement suggests that the parties intended for Gallo to obtain a waiver of subrogation under any other unspecified insurance policy that it had. Therefore, we reject ArcelorMittal's argument that Travelers' subrogation claim is barred by the terms of the supply contract.

¶ 20    Because the supply contract did not require Gallo to obtain a waiver of subrogation rights in its inland marine policy issued by Travelers, Travelers, as subrogee, is entitled to recover the amount it paid to Gallo for the damage sustained to the tractor under section 4(a) of the supply contract. Therefore, because ArcelorMittal does not challenge its liability for the damages Gallo sustained, the circuit court's entry of summary judgment on the issue of liability in favor of Travelers as Gallo's subrogee is affirmed.

¶ 21    In affirming the entry of summary judgment in favor of Travelers on the issue of liability, we do not consider ArcelorMittal's argument that the nonassignment provisions in section 10 of the supply contract evidences the intent of the parties regarding the waiver of subrogation issue discussed above. ArcelorMittal's argument is forfeited because it was raised for the first time at oral argument. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."). Although ArcelorMittal's appellate brief referenced section 10 in its statement of facts, the argument section of its appellate brief contains no discussion of section 10. Therefore, ArcelorMittal forfeited any argument regarding section 10.

¶ 22    Next, ArcelorMittal argues that questions of fact remain with respect to damages and, consequently, that the summary judgment damage award of $305,625 in Travelers favor should be reversed. It argues that the tractor was purchased in 2005 for $113,000, and that Gallo invested another $90,000 in parts and labor. Also, a detachable mast was attached to the tractor that was worth $50,000, which was repaired after the fire, and Gallo was able to continue using it. ArcelorMittal further argues that during negotiations with Gallo, Gallo made varying claims as to the value of the tractor and that ArcelorMittal made its own offer based on its fair market valuation of the tractor. ArcelorMittal contends that the circuit court ignored questions of fact about the tractor's fair market value and instead simply awarded Travelers what it asked for.

¶ 23    Fatal to ArcelorMittal's argument, however, is the fact that ArcelorMittal failed to actually contest Travelers' motion for summary judgment on the amount of damages in the circuit court. Travelers' motion for summary judgment asserted that there were no genuine issues of material fact as to damages. In support of its motion, Travelers attached numerous exhibits including Michael Gallo's deposition transcript wherein he testified as to his knowledge and

experience within the equipment industry, as well as to the damage to the tractor. Mr. Gallo further testified that he received a $318,000 repair quote from the tractor's manufacturer. A copy of the quote—identified as an exhibit to Mr. Gallo's deposition—was attached to Travelers' motion for summary judgment. The repair quote reflects that several components, including the chassis and engine, needed to be rebuilt. Mr. Gallo testified that Travelers deducted a "salvage value" and Gallo's deductible from the service quote and issued Gallo a check for $305,625. Section 6(b) of the supply contract provides that ArcelorMittal "*shall be responsible for the cost to repair* or replace Equipment rendered inoperable by misuse, abuse or neglect, or any event for which [ArcelorMittal] has the risk of loss in accordance with Section 4(a) hereof." (Emphasis added.) Therefore, the cost of repair—$318,000—was an appropriate measure of damages for Travelers' subrogation claim.

¶ 24    Travelers' motion for summary judgment on the issue of damages therefore argued that ArcelorMittal was liable under the supply contract for $318,000. ArcelorMittal's response did not raise any objection to Mr. Gallo's deposition testimony or the repair quote. ArcelorMittal's only response to Travelers' motion for summary judgment on the issue of damages consisted of a single footnote:

> "Travelers also argues that it has established damages in this case; however, damages, to the extent Travelers is entitled to any, is an extremely contested issue. [Mr.] Gallo previously represented in a letter to ArcelorMittal that the value of the tractor, without its mast (which was the condition Travelers [*sic*] bought the tractor) was worth $235,000, not the $318,000 claimed in Travelers'[s] brief. (See December 20, 2012, letter, attached *** as *Exhibit 5*). Further, Gallo itself claims to have bought the tractor for $113,000 and spent $90,907 in refurbishing it in 2006. Therefore, Gallo paid $203,907 for the refurbished tractor, the tractor depreciated due to use at a steel mill for 6 years, and now Travelers claiming [*sic*] that the tractor *increased in value by over a* [*sic*] *$100,000.* ArcelorMittal disputes this unsupported contention by Travelers." (Emphases in original.)

¶ 25    Asserting in a footnote that damages are contested is not the same as contesting damages with admissible evidence, and a footnote not supported by evidence submitted to the circuit court does not raise a question of fact that will defeat a motion for summary judgment. Furthermore, attaching a settlement proposal from an opposing party does not correct this deficiency. ArcelorMittal attached to its summary judgment response a letter dated December 20, 2012, from Mr. Gallo, wherein Gallo asserted that the market value of the tractor was $285,000 and the value of the detachable mast was $50,000, and he offered to settle for $235,000. Even if an argument contained in a footnote in a circuit court filing were deemed sufficient to establish a contested issue of fact, ArcelorMittal makes no argument on appeal that the December 20, 2012, letter would have been admissible at trial. Illinois Rule of Evidence 408(a)(2) (eff. Jan. 1, 2011) provides that "conduct or statements made in compromise negotiations regarding [a] claim" are inadmissible to prove the amount of a disputed claim. Because no argument was made or advanced below that Gallo's letter was admissible evidence, ArcelorMittal could not rely on the letter to create a genuine issue of material fact. *Rodriguez*, 2012 IL App (1st) 113155, ¶ 14. Therefore, in the face of a motion for summary judgment on the issue of damages, ArcelorMittal offered no admissible evidence to create any genuine issue of material fact as to the damages claimed by Travelers. Instead, it appears ArcelorMittal attempted to reserve the issue of damages until the circuit court

determined the issue of liability. ArcelorMittal cites no authority to support the notion that a party responding to a motion for summary judgment on both liability and damages may avoid summary judgment on damages by simply asserting in a footnote that "damages [are] an extremely contested issue." To establish a contested material issue of fact, ArcelorMittal was required to submit relevant, admissible evidence on the issue of damages in the circuit court. In the absence of any such evidence, the circuit court correctly entered judgment in the amount of the adjusted repair cost that Travelers paid Gallo, or $305,625.

¶ 26    ArcelorMittal's argument that the circuit court erred in its damage award because the fair market value of the equipment was not established also fails. Section 6(b) of the supply contract provides that ArcelorMittal "*shall be responsible for the cost to repair* or replace Equipment rendered inoperable by misuse, abuse or neglect, or any event for which [ArcelorMittal] has the risk of loss in accordance with Section 4(a) hereof." (Emphasis added.) As stated, Mr. Gallo's testimony and the repair estimate showed that the cost of repair was $318,000 because several components, including the chassis and engine, needed to be rebuilt. Mr. Gallo testified that Travelers deducted a "salvage value" and Gallo's deductible from the service quote, and issued Gallo a check for $305,625. Therefore, the adjusted cost of repair paid by Travelers to Gallo was an appropriate measure of damages on Travelers' subrogation claim. ArcelorMittal failed to identify any factual or contractual basis that would preclude the entry of summary judgment in favor of Travelers on the issue of damages based on the cost of repair, rather than the market value of the damaged equipment. Therefore, the circuit court's $305,625 damage award in favor of Travelers is affirmed.

¶ 27    In sum, the circuit court properly entered summary judgment in favor of Travelers on its subrogation claim that ArcelorMittal breached its contract with Gallo.

¶ 28    Finally, because we have affirmed the entry of summary judgment in favor of Travelers based on our finding that the supply contract did not require Gallo to obtain subrogation waivers under all of its insurance policies, we affirm the circuit court's dismissal of ArcelorMittal's claim that Gallo breached the supply contract by failing to obtain a subrogation waiver for its inland marine policy issued by Travelers. ArcelorMittal has forfeited its argument, raised for the first time during oral argument, that its third-party breach of contract claim against Gallo was based in part on Gallo's failure to name ArcelorMittal as an additional insured pursuant to section 11 of the supply contract. This argument is forfeited because it was raised for the first time at oral argument. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). ArcelorMittal's appellate brief focused solely on the issue of whether Gallo was required to obtain subrogation waivers and made no mention of whether Gallo failed to add ArcelorMittal as an additional insured. By not advancing any argument in its appellate brief that Gallo breached the supply contract by failing to have ArcelorMittal named as an additional insured, ArcelorMittal forfeited any argument in support of reinstating ArcelorMittal's breach of contract claim on that basis.

¶ 29                                    III. CONCLUSION

¶ 30    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 31    Affirmed.